UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
Conservation Law Foundation, Inc.        )
                                        )        Case No. 1:16-CV-12451-RGS
        Plaintiff,                       )
                                        )        **CONSERVATION LAW FOUNDATION**
                                        )        **OPPOSITION TO DEFENDANT'S**
        v.                               )        **MOTION TO DISMISS**
                                        )
American Recycled Materials, Inc.        )
                                        )
        Defendant.                       )
_____)

Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") hereby submits its

opposition to defendant American Recycled Materials, Inc.'s ("ARM" or "Defendant") Motion

to Dismiss and supportive Memorandum of Law filed on March 19, 2017 in the above-captioned

matter. ARM argues that CLF lacks standing to bring any of the asserted claims, the Court lacks

subject matter jurisdiction and the complaint fails to state a claim for relief. Defendant's motion

should be denied in its entirety.

## Introduction

CLF brought suit against ARM under the Federal Water Pollution Control Act, 33 U.S.C.

§§ 1251–1387 ("CWA," or "the Act"), alleging violation of CWA § 301(a)'s prohibition on

discharge of pollutants without a permit issued pursuant to CWA § 402. 33 U.S.C. §§ 1311(a),

1342. Section 301(a) of the Act makes "the discharge of any pollutant by any person . . .

unlawful" except in conformance with enumerated statutory provisions. *Id.* § 1311(a). The

statutory prohibition may be avoided if a discharge is permitted through the National Pollutant

Discharge Elimination System ("NPDES") under section 402 of the CWA. *Id.*, cf., § 1342.

ARM's discharges of stormwater associated with industrial activity and of process wastewater

1

fall within the CWA's definition of "discharge of a pollutant" and have not been permitted under the NPDES program. As a result, ARM's discharges violate Section 301(a) of the CWA.

CLF's complaint alleges, among other claims, that Defendant discharges stormwater containing a variety of pollutants associated with industrial activities at Defendant's facility, that the stormwater pollution is collected, channeled, and conveyed into Bogastow Brook, which flows into South End Pond and thereafter, into the Charles River, all navigable waters of the United States. Additionally, CLF's complaint alleges that A discharges process wastewater into waters of the United States. CLF's complaint further alleges that Defendant's stormwater discharge is in violation of § 301(a) of the Act because the discharge is not, and has never been, permitted under § 402 of the Act or under the EPA regulations set forth at 40 C.F.R. § 122.26 requiring industrial dischargers to submit applications for permit coverage no later than October 1, 1992, and that Defendant's process wastewater discharge is also in violation of § 301(a) of the Act because the discharge is not, and has never been, permitted under § 402 of the Act. Therefore, Defendant's unpermitted discharges of pollutants to navigable waters are subject to citizen suit enforcement under § 505(a)(1) of the Act. 33 U.S.C. § 1365(a)(1).

CLF has properly alleged discharges of stormwater and process wastewater from point sources at the facility to navigable waters without a permit and will prove those allegations at trial. CLF has properly alleged facts demonstrating its standing to bring this action on behalf of its members. Defendant will have an opportunity to contest CLF's evidence and expert testimony at trial but for the purpose of the present motion, all of CLF's factual allegations are accepted as true and, taken together with the reasonable inferences drawn in CLF's favor, CLF has properly stated a claim under the citizen suit provision of the Act. Defendant's motion must be denied.

**<u>Standard of Review</u>**

Where issues are raised in the procedural posture of a Rule 12(b)(1) motion, the court's review "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof and, accordingly, the issue on a motion to dismiss is not whether the plaintiffs will prevail, but whether the plaintiffs are entitled to offer evidence to support their claims." *Soundkeeper, Inc. v. A & B Auto Salvage, Inc.*, 3:12-CV 00841-CSH, 2014 WL 1998244 (D. Conn. May 15, 2014) (internal quotations and citations omitted). Similarly, when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a "court must take all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *D.D.S. Indus., Inc. v. C.T.S., Inc.*, CIV.A. 11-11561-MBB, 2012 WL 2178962 (D. Mass. June 13, 2012) (*quoting Pettengill v. Curtis*, 584 F. Supp. 2d 348, 362 (D. Mass. 2008)) (internal citations and quotations omitted).

## <u>Argument</u>

### I.     **CLF Has Article III Standing to Bring this Citizen Suit**

An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Env'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (*citing Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). ARM's motion to dismiss focuses on the first prong of this test. Thus, to establish standing, CLF must demonstrate that a member of CLF:

> (1) has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc.*, 528 U.S. at 180–81.

### A.      CLF's Complaint Alleges Facts Sufficient to Establish Standing

Section 505 of the CWA provides, in pertinent part, that "any citizen may commence a civil action on his own behalf [. . .] against any person . . . who is alleged to be in violation of . . . an effluent standard." 33 U.S.C. § 1365(a)(1). A "citizen" is defined to be "a person or persons having an interest which is or may be adversely affected." *Id.* § 1365(g). The term "effluent standard or limitation" is defined to include, among other things, any violation of § 301(a)'s strict prohibition on discharges without a permit. *Id.* § 1365(f). The discharge of a pollutant without an NPDES permit issued pursuant to § 402 is an unlawful act under CWA § 301(a). *See id.* § 1311(a) ("Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."). Section 505(f)(1), therefore, explicitly authorizes citizen suits against any person discharging a pollutant without a § 402 permit.

This cause of action has been recognized by numerous courts. *See, e.g., Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 559, 563 (5th Cir. 1996) ("Reading these sections together with § 1365(a) and (f), it is clear that a citizen may bring an action under the CWA against any person who is *allegedly* discharging a pollutant without a NPDES permit") (emphasis added), 563. Moreover, courts recognize, generally, that "[c]itizen suits 'perform an important public function' and 'should be handled liberally[.]'" *Deschutes River Alliance v. Portland General Electric Co.,* No. 3:16-cv-1644-SI (D.Or. Mar. 27, 2017) (*quoting Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1525 (9th Cir. 1987).

Under the Supreme Court's ruling in *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972), interests that are or may be adversely affected include noneconomic interests, such as aesthetic, conservational or recreational values. Indeed, as the U.S. Supreme Court stated more

recently: "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc*., 528 U.S. at 183 (internal quotation and citation omitted).[1]

Here, CLF has pled sufficient facts in its complaint, taken as true and construed in favor of CLF as they must be in the context of ARM's motion to dismiss, to establish CLF's associational standing to pursue its claims. *See, e.g., CLF v. Plourde Sand & Gravel Co.*, No. 13-CV-214-SM, 2014 WL 5781457, at *1 (D.N.H. Nov. 6, 2014) (unpublished Order denying defendant's motion to dismiss attached hereto for the Court's convenience as Exhibit A). Moreover, as discussed below, when ARM raised the issue of standing in its motion to dismiss, CLF properly and promptly supplemented the record with sworn declarations from three of its affected members. *See* Exhibits B, C and D attached hereto.[2] This is permissible and appropriate in responding to ARM's motion. *See, e.g., CLF v. Continental Paving*, No. 16-CV-339-JL, 2016 WL 7116019, at *3–4 (D.N.H. Dec. 6, 2016) (unpublished Order denying defendant's motion to dismiss attached hereto for the Court's convenience as Exhibit E).

As stated in its complaint: CLF is a nonprofit, member-supported regional organization dedicated to protecting New England's environment; it has a long history of working to protect the health of Massachusetts' waterways, including addressing the water quality impacts of stormwater pollution; its members use and enjoy New England's waterways for recreational and aesthetic purposes, including but not limited to waters of the United States affected by ARM's

---

[1] And the adverse effect need not be great—"Congress has identified NPDES violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of water into which a permittee's effluents flow." *Student Pub. Interest Research Grp. of N.J., Inc. v. Georgia-Pacific Corp.*, 615 F. Supp. 1419, 1424 (D.N.J. 1985).
[2] CLF has attached three sworn affidavits signed using the "/s/" convention. Should this honorable court require the attached member declarations with original signatures CLF will provide them promptly.

unpermitted discharges of pollutants; and CLF actively seeks federal and state agency implementation of the Act and, as necessary, directly initiates enforcement actions on behalf of itself and its members. *See* Complaint, Case No. 1:16-CV-12451-RGS ("Complaint"), ¶ 16.

CLF has alleged facts sufficient to establish standing. In a CWA case, a plaintiff may establish a substantial likelihood that defendant caused plaintiffs' harm by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs. *Pub. Interest Research Grp. of N.J., Inc. v. Duffryn Terminals Inc.*, 913 F.2d 64, 72 & n.8 (3d Cir. 1990). Here, as alleged in CLF's Complaint: (1) ARM has no CWA discharge permit, thus any discharge to waters of the United States is a violation of Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342, Complaint ¶ 46; (2) stormwater runoff and process wastewater from ARM's activities have been and continue to be discharged into Bogastow Brook through multiple point source outfalls, Complaint ¶¶ 44, 50; and (3) these discharges of stormwater associated with industrial activity contribute to the kinds of injuries alleged by CLF, *see* Complaint ¶ 17. Therefore, CLF has standing and ARM's motion must be denied.

**B.     The Three Declarations from CLF's Affected Members Further Establish that CLF has Standing to Bring this Citizen Suit**

CLF has further established that it has standing to maintain this suit through the sworn declarations of three of its members, Sierra H. Bright, Cornelia C. Roberts, and Sara L. Wragge. *See* Declaration of Sierra H. Bright ("Bright Declaration"), Declaration of Cornelia C. Roberts ("Roberts Declaration"), and Declaration of Sara L. Wragge ("Wragge Declaration"), Exhibits B, C and D. These declarations establish injury in fact, causation, and redressability.

Defendant's arguments regarding standing are similar to those considered and rejected by the court in *Student Pub. Interest Research Grp. of N.J., Inc. v. Georgia-Pacific Corp.*, 615 F. Supp. 1419, 1424 (D.N.J. 1985). In that case, "Defendant initially challenged plaintiffs' standing to sue on the grounds that they had failed to plead facts demonstrating that particular members of the organization are adversely affected in some specific way." *Id.* at 1423. The Court, in denying defendant's motion to dismiss, noted that defendant's position was not tenable in light of plaintiffs' subsequent submission of "affidavits from members of [plaintiff environmental groups] who live in the region adjacent to the Delaware River downstream from defendant's . . . facility." *Id.*; *see also Continental Paving*, Exhibit F at *3–4.

<u>Bright Declaration</u>

The Bright Declaration establishes, *inter alia*, that Ms. Bright is a member of CLF owns land on the shores of the Charles River downstream of ARM's facility on Bogastow Brook where she lives and operates a farm. Bright Declaration, Exhibit B ¶¶ 2, 3–5. Ms. Bright cares greatly about the quality of the natural environment, including water resources. *Id.* ¶ 3. It is very important to Ms. Bright that the health and cleanliness of the Charles River is protected, and she hopes that unpermitted discharges, including stormwater pollution associated with industrial activities, will not be allowed and that the river will benefit from the full protections of the Act. *Id.* ¶ 11. Ms. Bright is very concerned that upstream unpermitted stormwater discharges adversely affect her lands and crops, including her ability to grow organic crops and to feed her horses hay grown on the land, because pollutants in the Charles River are deposited on her farm fields when the river floods her lands. Complaint at ¶ 14. Ms. Bright's use and enjoyment of the Charles River is impaired, but even more concerning to her is the threat that ARM's unpermitted pollutant discharges pose to her land and livelihood.

Roberts Declaration

The Roberts Declaration establishes, *inter alia*, that Ms. Roberts is a longstanding member of CLF due to her interest in protecting the quality of the natural environment, including water resources. Roberts Declaration, Exhibit C ¶ 3. Ms. Roberts greatly appreciates the natural resources of the Sherborn, Massachusetts area, and has used and enjoyed water bodies in the area, including Bogastow Brook and the Charles River, throughout her fifty years in Sherborn. *Id.* ¶¶ 2, 4. Her use and enjoyment of the Charles River includes walking her dogs on conservation land alongside the Charles River downstream of Bogastow Brook on a regular basis, enjoying views of the river, observing wildlife, and allowing her dogs to drink from and swim in the river. *Id.* ¶¶ 4, 7. Ms. Roberts intends to continue to use and enjoy the Charles River in the future. *Id.* ¶ 9. Protecting the health of local waters, including Bogastow Brook and the Charles River, is very important to Ms. Roberts, and she is concerned that progress in cleaning up the rivers will be derailed if environmental laws are not properly implemented or complied with. *Id.* Failure to adequately protect Bogastow Brook, the Charles River and connected waters in the area "would greatly detract from one of the important factors that contributes to [her] quality of life as a Sherborn resident – the presence and protection of our natural resources." *Id.* ¶ 14. Such a diminution of Ms. Roberts' enjoyment is a cognizable injury. *See, e.g., American Bottom Conservancy v. U.S. Army Corps of Engineers*, 650 F.3d 652, 657–58 (7th Cir. 2011) (diminished pleasure in outdoor recreational activity constitutes an injury.).[3]

Wragge Declaration

---

[3] "The district judge thought that to establish standing the affiants had to attest that they would be so upset by the diminution in their bird- and wildlife-watching activities that they would no longer visit the state park. That is wrong; it is enough to confer standing that their pleasure is diminished even if not to the point that they abandon the site. For that diminution is an injury." *American Bottom Conservancy*, 650 F.3d at 657–658.

The Wragge Declaration establishes, *inter alia*, that Ms. Wragge is a member of CLF who resides in Sherborn, Massachusetts and who has, over the past 37 years, engaged in a variety of recreational activities on the Charles River downstream of Bogastow Brook and on the South End Pond in Millis, Massachusetts. Wragge Declaration, Exhibit D ¶¶ 2–4. Ms. Wragge's recreational use and enjoyment of the Charles River downstream of Bogastow Brook includes kayaking, observing wildlife, and walking, snowshoeing, and cross country skiing. *Id.* ¶¶ 4–5. She intends to continue to use the Charles River and South End Pond and protecting the health and cleanliness of these waters is important to her. *Id.* ¶ 6. Ms. Wragge would enjoy the use of these resources more if sources of stormwater pollution, including ARM's facility on Bogastow Brook, complied with the CWA and reduced pollution. *Id.* ¶ 10.

### 1.    The Bright, Roberts and Wragge Declarations Establish Injury in Fact

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth*, 528 U.S. at 183; *see also Sierra Club v. Morton*, 405 U.S. at 735. The scale of injury need not be significant, and is not germane for purposes of standing. *See Powell Duffryn Terminals Inc.*, 913 F.2d at 71 & n.8. Here, Ms. Bright, Ms. Roberts and Ms. Wragge have each demonstrated an interest in using and enjoying the Charles River downstream of Bogastow Brook, as well as associated waters and lands, and ensuring that these resources, and their future use and enjoyment of them, are protected. Their enjoyments of the aesthetic and recreational values of these waters are diminished by unpermitted and unmitigated pollutant discharges into waters they use and enjoy, thereby injuring them. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–563 (1992); *see also Friends of the Earth, Inc.*, 528 U.S. at 183.

To the extent that ARM is arguing that CLF lacks standing because CLF has not proved that ARM's unpermitted pollutant discharges harm Ms. Bright, Ms. Roberts and Ms. Wragge, ARM "puts the cart before the horse; it assumes the outcome on the merits in making its preliminary standing objection." *Town Of Winthrop v. F.A.A.*, 535 F.3d 1, 6 (1st Cir. 2008); *see also Plourde Sand & Gravel Co.*, Exhibit A at 14 ("requiring CLF to show environmental harm in order to establish standing, would raise the standing hurdle higher than the necessary showing for success on the merits") (internal quotation and citation omitted).

### 2.     The Bright, Roberts, and Wragge Declarations establish causation

The injuries suffered by Ms. Bright, Ms. Roberts, and Ms. Wragge are fairly traceable to ARM's unpermitted discharges from its industrial facility. It is not necessary for CLF, or CLF's members, to establish "to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs." *Powell Duffryn Terminals*, 913 F.2d at 72. In *Student Pub. Interest Research Grp. of N.J., Inc. v. Tenneco Polymers, Inc.*, the defendant argued "that the injuries set forth by the plaintiffs are insufficient to give them standing to sue [and asserted] that while the plaintiffs have set forth that they are injured by the general pollution of the Delaware River, they have not shown that these injuries are caused specifically by the alleged violations of Tenneco Polymers." *Student Pub. Interest Research Grp of N. J., Inc. v. Tenneco Polymers*, *Inc.*, 602 F. Supp. 1394, 1397 (D.N.J. 1985). The court rejected defendant's standing challenge as "overly burdening the plaintiffs," stating:

> Obviously, the pollution of a portion of a major, interstate waterway such as the Delaware River, is caused by the combination of discharges from many different sources. The effect of the defendant's argument would be to prohibit any citizens' suits against violators of the FWPCA unless the violation was so great or the waterway so small that the direct impact of the discharges could be pinpointed.

*Id. See also Plourde Sand & Gravel*, Exhibit A at 14; *Georgia-Pac. Corp.*, 615 F. Supp. at 1424;

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64–65 (1987) (stating

that the CWA citizen suit provision confers jurisdiction when plaintiff alleges defendant to be in

violation of the Act).[4]

### 3.     The Bright, Roberts, and Wragge Declarations are Sufficient to Establish Redressability

CLF alleges, and Ms. Bright, Ms. Roberts and Ms. Wragge understand and aver, that

ARM is required to obtain CWA discharge permits for its discharges of stormwater associated

with industrial activity and its discharge of process wastewater. In order to qualify for the

applicable CWA general permit—the Multi-Sector General Permit for Stormwater Discharges

Associated Industrial Activity ("MSGP 2015")[5]—ARM will first have to develop and implement

a stormwater pollution prevention plan. The stormwater pollution prevention plan ("SWPPP") is

a suite of control measures and best management practices designed to mitigate the harmful

effects of stormwater runoff from industrial facilities like Defendant's. ARM's discharges of

industrial stormwater and of process wastewater have been and continue to be unpermitted, and

ARM has not implemented a SWPPP, nor taken any other steps to comply with the requirements

of relevant CWA permits or other permitting requirements under the Act.

If ARM were to apply for, obtain, and comply with the conditions of CWA discharge

permits, as CLF seeks in this action, Ms. Bright, Ms. Roberts and Ms. Wragge's use of the

Charles River would be more enjoyable, knowing that ARM has developed and implemented a

---

[4] "[W]e agree that § 505 confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation . . . Petitioner argues that citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches under § 505 . . . We cannot agree. The statute does not require that a defendant 'be in violation' of the Act at the commencement of suit; rather, the statute requires that a defendant be '*alleged* to be in violation.'. . . our standing cases uniformly recognize that allegations of injury are sufficient to invoke the jurisdiction of a court." *Gwaltney*, 484 U.S. at 64–65 (citation omitted).

[5] ARM could alternatively apply for and obtain coverage under an individual NPDES permit - indeed, an individual NPDES permit is required for ARM's discharges of process wastewater, as alleged in the Complaint ¶¶ 1, 3,  and 7.

plan to prevent or at least mitigate the harm from its stormwater discharges and otherwise complied with standards associated with a NPDES permit, thereby alleviating their injuries. *See Sierra Club, Lone Star Chapter*, 73 F.3d at 556 ("All of the affiants expressed fear that the discharge of produced water will impair their enjoyment of these activities because these activities are dependent upon good water quality. Clearly, Sierra Club's affiants have a 'direct stake' in the outcome of this lawsuit.").

CLF's claims, and Ms. Bright's, Ms. Roberts, and Ms. Wragge's injuries, are based upon CLF's well-founded allegations of ARM's illegal discharges of stormwater associated with industrial activity and process wastewater in the absence of the required CWA discharge permits. The injunctive relief and civil penalties sought by CLF will provide redress for those injuries through (1) requiring ARM to qualify for permit coverage by implementing control measures and best management practices, (2) requiring ARM to apply for and obtain a permit, thereby bringing ARM into the regulatory fold and thus requiring that it monitor and report its discharges on a regular basis, and (3) requiring ARM to pay appropriate civil penalties, thereby deterring ARM, and other industrial facility owners and operators, from continuing to violate the CWA. *See Powell Duffryn Terminals*, 913 F.2d at 73 ("The general public interest in clean waterways will be served in this case by the deterrent effect of an award of civil penalties. Penalties will deter both PDT specifically and other NPDES permit holders generally. Thus PIRG's members' injuries may be redressed by a favorable decision in this case.").

## II.    CLF has Stated a Claim Upon Which Relief Can be Granted

The standard of review for Rule 12(b)(6) motions to dismiss was made clear by this court in 2012:

> When considering a motion to dismiss pursuant to Rule 12(b)(6) . . . a "court must 'take all factual allegations as true and draw all reasonable inferences in favor of

the plaintiff.'" *Pettengill v. Curtis*, 584 F. Supp. 2d 348, 362 (D.Mass.2008)
(quoting *Rodriguez–Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 96 (1st Cir.2007));
*see also Alternative Energy, Inc. v. St. Paul Fire and Marine Insurance Co.*, 267
F.3d 30, 33 (1st Cir.2001). To withstand a Rule 12(b)(6) motion, the complaint
must include factual allegations that, when taken as true, demonstrate a plausible
claim to relief even if actual proof of the facts is improbable. *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544, 555–58, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also
Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)
("claim has facial plausibility when the plaintiff pleads factual content that allows
the court to draw reasonable inference that the defendant is liable for the
misconduct alleged"); *Trans–Spec Truck Service, Inc. v. Caterpillar Inc.*, 524 F.3d
315, 320 (1st Cir.2008). To withstand a motion to dismiss, the complaint must state
more than mere conclusions of law reciting the elements of the cause of action.
*Twombly*, 550 U.S. at 555; see also *Iqbal*, 556 U.S. at 677–79.

In order to determine whether a Rule 12(b)(6) motion should be granted, a court
should consider the complaint and any documents attached to it. Rule 12(b)(6),
Fed.R.Civ.P.; see *Trans–Spec Truck Service, Inc. v. Caterpillar Inc.*, 524 F.3d 59,
65–66 (1st Cir.2008) (court may consider documents incorporated by reference in
the complaint, "'matters of public record, and other matters susceptible to judicial
notice'" without converting Rule 12(b)(6) motion to a summary judgment
motion)[.]

*D.D.S. Indus., Inc. v. C.T.S., Inc.*, CIV.A. 11-11561-MBB, 2012 WL 2178962 (D. Mass.

June 13, 2012).

A complaint that satisfies the pleading requirements of Rule 8(a)(2) is sufficient to

survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Ocasio–Hernandez v. Fortuno–

Burset*, 640 F.3d 1, 11 (1st Cir. 2011). Even where a complaint could have been pleaded more

clearly, if it alleges sufficient facts to state a facially plausible claim and gives the defendant fair

notice of the nature and basis for the claims, then dismissal for violation of Rule 8 and failure to

state a claim is unwarranted. *Envisn, Inc. v. Davis*, CIV.A. 11-12246-FDS, 2012 WL 1672887

(D. Mass. May 11, 2012).

Here, CLF's Complaint, together with the 60-day notice letter that was sent to Defendant

via certified mail on September 16, 2016 and attached to the Complaint as Exhibit A and

incorporated therein by reference ("60-Day Notice"), states facially plausible claims, alleges

facts sufficient at the pleading stage to support those claims, and gives Defendant fair notice of the nature and basis for the claims. Plaintiff's pleading goes well beyond mere conclusions of law reciting the elements of the cause of action and alleges in considerable detail that Defendant has discharged and continues to discharge polluted stormwater and process water runoff from point sources within its industrial facility into navigable waters, without the required permits.

### A. The 60-Day Notice and Complaint Set Forth Factual Allegations Demonstrating a Plausible Claim for Relief

The 60-Day Notice states at 7 that "The Facility is generating pollutants from and through at least the following point sources: the sand, gravel, and various other material piles that are open to the elements; the machines and equipment left outdoors, and the vehicles driving on and off the Facility, while additionally conveying pollutants through site grading, surface water channels, subsurface hydrological connections, detention ponds, culverts, and other conveyances to Bogastow Brook." In footnote 25 to the above statement, the 60-Day Notice states that "[t]hese discharges constitute "point sources" as defined by 33 U.S.C. § 1362(14) and 40 C.F.R. §122.2."

CLF's Complaint properly alleges facts supporting its claims, including CLF's cause of action for Defendant's discharge of pollutants without the required discharge permits. As discussed above, the discharge of a pollutant to navigable waters without a NPDES permit issued pursuant to § 402 is unlawful under § 301(a). 33 U.S.C. §§ 1311(a), 1342. Section 505(f)(1) explicitly authorizes citizen suits against any person discharging a pollutant without a § 402 permit. *Id.* § 1365(f)(1). The elements of CLF's cause of action are (i) discharge of a pollutant, (ii) from a point source, (iii) to waters of the United States, (iv) without a permit. CLF's Complaint properly alleges each of these elements and Defendant's motion must be denied.

### 1. CLF's Complaint Properly Alleges Discharge of a Pollutant

The Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). This definition has been repeatedly applied by the federal courts in the context of citizen suits to evaluate whether discharges are in violation of § 301(a).[6] CLF's Complaint clearly alleges that during precipitation events and instances of snowmelt, water flows over and across exposed materials and accumulated pollutants at Defendant's facility, generating stormwater runoff that enters Bogastow Brook and its associated tributaries and wetlands, waters of the United States. Complaint, ¶¶ 39–40, *see also* ¶¶ 33–38.

CLF's Complaint properly alleges that the pollutants discharged from ARM's facility are stormwater associated with industrial activities that are covered by the MSGP 2015. *See* Complaint, ¶ 32. The determination of whether Defendant's facility is properly classified as an industrial facility is a mixed question of fact and law, heavily dependent upon the circumstances and made on a case by case basis by considering several factors. Based on ARM's own description of operations at its facility, Defendant's primary activity is properly categorized as an industrial one subject to coverage by the MSGP 2015. *See* Exhibit F, Aerial Image of ARM's Facility (May 10, 2016). ARM admits that its facility engages in "recycling previously manufactured construction building materials," that it "takes in construction [asphalt, brick and concrete] debris, temporarily stockpiles it, and upon sufficient accumulation crushes it to create 'construction aggregate' (small size stone-like product)," and that the "current use involves portable crushers, screeners, conveyors, and loaders used to move and process the materials." Motion to Dismiss at 4. The MSGP 2015 covers "stormwater discharge[s] . . . associated with

---

[6] *See e.g., Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 489–494 (2d Cir. 2001); *Concerned Area Residents for Environment v. Southview Farm*, 34 F.3d 114 (2d Cir. 1994); *Dague v. City of Burlington*, 935 F.2d 1343, 1354–55 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 557.

industrial activity from [a facility's] primary industrial activity," and specifically enumerates "Scrap Recycling and Waste Recycling Facilities" as a covered category (SIC 5093). MSGP 2015 at 1, 129, D-4. The United States Department of Labor, Occupational Safety and Health Administration defines SIC Code 5093 to include "[e]stablishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials."[7]

ARM contests this categorization, electing to describe its industrial activities instead as "wholesale recycling and distribution of asphalt, brick and concrete," SIC Code 5032, a category that ARM argues is not covered by the MSGP 2015. Motion to Dismiss at 10–11. Aside from ARM's own description, and a letter from U.S. E.P.A. Region 1 "[b]ased on the information presented to EPA" presumably by Defendant, Motion to Dismiss, Exhibit C, ARM offers no support for why its facility's primary industrial activity should be classified as an operation that is incidentally excluded from coverage by the MSGP 2015, rather than as a scrap and waste recycling facility. *See* MSGP 2015 at A-6 (defining primary industrial activity and describing several methods for determining a facility's primary industrial activity, including: "In situations where the vast majority of on-site activity falls within one SIC code, that activity may be the primary industrial activity."); *see also* Exhibit F.

The factual determination of ARM's primary industrial activity goes to the merits of the case and CLF need not prove its allegations in this opposition. CLF looks forward to further development of the facts regarding ARM's discharges of stormwater associated with industrial activity in discovery. Moreover, CLF alleges that ARM discharges process wastewater without a NPDES permit, which is a violation of CWA Section 301(a)'s strict prohibition on unpermitted discharges regardless of ARM's SIC code. Based on the information currently available to CLF,

[7] https://www.osha.gov/pls/imis/sic_manual.display?id=993&tab=description (last visited April 1, 2017).

16

CLF maintains its good faith belief that ARM (a) discharges stormwater associated with industrial activity without NPDES permit coverage pursuant to 33 U.S.C. §§ 1342 & 1311, 40 C.F.R. § 122.26(b)(14) and the MSGP 2015, and (b) discharges process wastewater without a permit..

### 2.     CLF's Complaint Properly Alleges that ARM's Discharges are From "Point Sources"

CLF's Complaint specifically alleges, and supports the reasonable inference, that ARM is discharging polluted stormwater runoff from point sources. *See, e.g.,* Complaint, ¶ 33, 35, 44, 58. The Act defines the phrase "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source"[8] and defines "point source" as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation or vessel . . . from which pollutants are or may be discharged."[9]  In promulgating its Phase I stormwater regulations in 1990, "EPA intend[ed] to embrace the broadest possible definition of point source consistent with the legislative intent of the CWA and court interpretations to include any identifiable conveyance from which pollutants might enter the waters of the United States."[10]

In applying this "broadest possible" definition, the federal courts have explained, "it contravenes the intent of [the CWA] and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point."[11] Accordingly, decisions from jurisdictions across the country have made clear that the term "point source" extends well

---

[8] 33 U.S.C. §1362(12); see also 40 C.F.R. § 122.2.
[9] 33 U.S.C. §1362(14) (emphasis added); *see also* 40 C.F.R. § 122.2.
[10] NPDES Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990, 47,997 (Nov. 16, 1990). *See also Concerned Area Residents for the Env't ["CARE"] v. Southview Farm,* 34 F.3d 114, 118 (2d Cir. 1994), cert. denied, 115 S. Ct. 1795 (1995) ("the definition of a point source is to be broadly interpreted").
[11] *See United States v. Earth Sciences, Inc*., 599 F.2d 368, 372 (10th Cir. 1979).

beyond pipes, culverts, and stormwater collection and disposal systems to include any discrete conveyance traceable to a single discharger, including, for example, piles of materials or debris, equipment, vehicles, and sediment ponds.[12] "[T]he touchstone for finding a point source is the ability to identify a discrete facility from which pollutants have escaped." *Hecla Mining*, 870 F.Supp. at 988.[13] So long as the discharge is from a discrete and identifiable source, the conveyance constitutes a point source requiring a NPDES permit. Here, CLF has properly alleged that the stormwater discharged from the ARM facility flows from numerous identifiable point sources to navigable waters.

> **3.      CLF's Complaint Properly Alleges that ARM's Point Source Discharges are to Waters of the United States**

CLF's Complaint alleges in good faith and supports the reasonable inference that ARM discharges stormwater associated with industrial activities and process wastewater into Bogastow Brook, a water of the United States. *See* Complaint, ¶¶ 8, 40, 42. The issue of whether Defendant discharges to a water of the United States is a mixed question of fact and law. CLF has attempted to garner additional information from ARM in an endeavor to bring the parties to a common understanding of the facts by requesting, multiple times, an early informal site visit to ARM's facility. Defendant has repeatedly refused. Nevertheless, CLF would not proceed if it did not have a good faith basis in its assertions underlying the claim.

---

[12] *See, e.g., Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1009 (11th Cir. 2004) ("debris and construction equipment qualifies as a point source under the CWA"); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983) (bulldozers and backhoes constitute point sources under the CWA); *Washington Wilderness Coalition v. Hecla Mining Co.*, 870 F.Supp. 983, 987-89 (E.D.Wash. 1994) (mine tailings ponds are point sources); *see also* EPA, NPDES Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990, 47,997 (1990).

[13] "Discharges from a refuse pile can easily be traced to their source. Thus, even though runoff may be caused by rainfall or snow melt percolating through a pond or refuse pile, the discharge is from a point source because the pond or pile acts to collect and channel contaminated water." *Id.*

According to information provided by Defendant, ARM's operations occur on the high point of a site that slopes down to Bogastow Brook. *See* Motion to Dismiss, Exhibit B, Sedimentation Pond Sketch; *see also* Exhibit F. ARM's documentation indicates that the site declines in elevation from a high point of 180 feet down to low points along the edge of Bogastow Brook of 153 and 154 feet. *See* Motion to Dismiss, Exhibit B, Sedimentation Pond Sketch. According to ARM, a berm less than 50 feet wide separates a sedimentation pond from Bogastow Brook (though satellite imagery suggests the berm is less wide). *See id*; *see also* Exhibit F. According to ARM's documentation, the water in the pond sits at an elevation approximately one foot below the land. *See* Motion to Dismiss, Exhibit B. It is not clear, but will be clear once CLF has access to ARM's facility during discovery, whether the pond has an outlet or under what conditions water discharges from the pond during heavy rain events or periods of snow melt. In any event, in addition to the pond, there are other points of discharge to Bogastow Brook, as CLF will prove at trial.

Based on this information and other information currently available to CLF, CLF maintains its good faith belief that ARM discharges stormwater associated with industrial activities and process wastewater into Bogastow Brook, a water of the United States. While, the factual elements of this issue go to the merits of the case and CLF need not prove its allegations in this opposition, CLF looks forward to further development of the facts in discovery, and intends to prove these facts at trial.

### 4. CLF's Complaint Properly Alleges that ARM's Point Source Stormwater Discharges to Waters of the United States are Unpermitted

The allegations set forth in CLF's Complaint both specifically alleging, and supporting the reasonable inference, that ARM is discharging polluted stormwater runoff without a permit include the following: "Defendant has failed to obtain coverage under the 2015 MSGP, or any

other valid NPDES permit for the Facility." Complaint, ¶ 46. "As of December 2, 2016,

Defendant does not hold a valid individual NPDES permit authorizing it to discharge process

wastewater." Complaint, ¶ 51. Moreover, the fact that ARM does not have (and apparently has

never had) permit coverage under the Clean Water Act is uncontested.

### III.   Defendant's Remaining Arguments Go to the Merits of this Case.

ARM raises a number of factual issues regarding maps, earthen berms, a sediment pond

and a gravel outwash, and attached a Property Base Map and Sedimentation Pond Sketch to its

Motion to Dismiss. These asserted facts go to the merits of this case. CLF acknowledges that it

received from Defendant documents including the Sedimentation Pond Sketch, maps, and photos

of ARM's facility. CLF looks forward to addressing ARM's factual assertions in due course

during discovery, further motion practice if needed, and at trial. But CLF need not prove its case

on the merits in responding to ARM's 12(b)(1) motion to dismiss for lack of standing and

12(b)(6) motion to dismiss for failure to state a claim.

### IV.   Request for Hearing

CLF does not oppose ARM's request for hearing.

### V.   Conclusion

For the foregoing reasons, Plaintiff CLF respectfully requests that Defendant's motion to

dismiss be denied.

Respectfully submitted this third day of April, 2017.

CONSERVATION LAW FOUNDATION, INC.

By its attorney,

*/s/ Emily K. Green*
Emily K. Green, Esq.
MA Bar No. 686281
Conservation Law Foundation
53 Exchange St. Suite 200
Portland, Maine 04101
(207) 210-6439
EGreen@clf.org

Dated: April 3, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the foregoing Conservation Law Foundation's Objection to Defendant's Motion to Dismiss was filed through the Court's electronic filing system ("ECF"), by which means a copy of the filing will be sent electronically to all parties registered with the ECF system.

*/s/ Emily K. Green*
Emily K. Green, Esq.
MA Bar No. 686281
Conservation Law Foundation
53 Exchange St. Suite 200
Portland, Maine 04101
(207) 210-6439
EGreen@clf.org

Dated: April 3, 2017